UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In the matter:

Cassondra C. House,   Case No. 17-30434-BEH

Debtor.   Chapter 13

**DECISION GRANTING CIT BANK, N.A.'S
MOTION FOR *IN REM* RELIEF FROM THE AUTOMATIC STAY**

This debtor has filed five Chapter 13 cases in seven years. She achieved plan confirmation in two of four prior cases, but all four were dismissed prior to discharge. The mortgage lender for her rental property received enough money through her third plan that the lender dismissed its foreclosure action. But additional arrears accrued, and now the lender seeks the extraordinary remedy of *in rem* relief, so that it can initiate and complete another foreclosure proceeding without fear of the debtor or co-debtor filing additional bankruptcy cases in the next two years.

To obtain that relief, the key element the lender must prove is whether the debtor has engaged in a scheme to delay, hinder or defraud the creditor. The creditor relies on the sheer volume of Chapter 13 cases filed, and the longstanding nature of the arrearage. In contrast, the debtor characterizes each of her five cases as a well-intended effort to pay creditors, frustrated by events outside her control, and her view that there can be no "scheme" where the Court already has found the debtor lacked bad faith in filing the present case and granted her motion to continue the stay.

A close review of the facts reveals that the debtor's serial filings, some directly timed to foreclosure case events, and some bearing unwarranted projections of rental income, compounded by disregard for her creditor's interests by failing to collect any rent from family members for several years, together are constituents of a scheme to delay or hinder a creditor from protecting its rights in the property. The Court will grant the request for *in rem* relief.

## Procedural History

Debtor Cassondra C. House filed a Chapter 13 petition on October 24, 2017. Because she had another Chapter 13 case pending in the preceding year, she also filed a motion to continue the automatic stay under 11 U.S.C. section 362(c)(3)(B). Creditor CIT Bank, N.A. ("CIT") objected because the debtor had failed to make full mortgage payments over the years on property located at 5272 N. 38th St. in Milwaukee, had filed four prior Chapter 13 cases, and had failed to file an affidavit of changed circumstances. (CM-ECF, Doc. No. 13.) Thereafter, the debtor did file an affidavit, asserting that medical reasons caused her to miss work and consequently miss plan payments in her last case. Counsel for CIT appeared at the November 21st hearing on the debtor's motion, at which only the debtor testified. No exhibits were presented. Finding factors in favor of continuing the stay as well as several factors disfavoring it, the Court considered that dismissal of the prior case due to health issues and surgery was a matter outside the debtor's control, and because she testified her income from her new employer was more salary-based and less commission-dependent, the likelihood that Ms. House would complete her Chapter 13 plan was improved. Accordingly, the Court granted the motion.[1] The Court entered the order continuing the stay on November 29, 2017.

The following day, CIT filed a motion seeking *in rem* relief from the stay and relief from the co-debtor stay. CIT's motion included a chronology of the debtor's treatment of the property in her four prior bankruptcy cases and the assertion that the present case "is part of a scheme to delay or hinder [CIT] from asserting its state law rights, and the multiple prior filings provide the requisite basis under 11 USC 362(d)(4)(B)." (CM-ECF, Doc. No. 23.) CIT also asserted that the Court's earlier determination that this case was filed in good faith and its consequent continuation of the stay, do not preclude the Court from determining that the debtor's multiple filings represent a scheme to delay or hinder CIT from collection on its claim. CIT viewed the good faith finding to

---

[1] CIT filed Proof of Claim No. 5 for $39,384.15 on November 24, 2017.

pertain to the case as a whole, and that the two discrete acts, filing a Chapter 13 case with multiple creditors in good faith and intending to delay specific creditor CIT from its repayment rights, are "not necessarily mutually exclusive." CIT also sought relief from the stay as to co-debtor Larry House under 11 U.S.C. section 1301(c)(2). Ms. House objected to CIT's motion, denying she filed this case as part of any scheme, reasserting that the Court had found her case was commenced in good faith, and contending that CIT failed to establish grounds for relief from the co-debtor stay. (CM-ECF, Doc. No. 30.)

The Court held a preliminary hearing on January 2, 2018, and an evidentiary hearing on January 25, 2018.[2] When it came to light that CIT had not provided proof of service on co-debtor Larry House, the Court issued an order requiring CIT to file a certificate of service proving that it properly served Mr. House with its motion, holding in abeyance its decision (and potential further evidentiary proceedings) until the certificate had been filed and the objection period had run, and ordering that the stay as to the property remain in place pursuant to 11 U.S.C. § 362(e)(1). (CM-ECF, Doc. No. 46.) The matter is now ripe for consideration because CIT filed a certificate of service of its motion for relief from stay, and there have been no subsequent objections.

### The Debtor's Loan with CIT

The debtor and Larry House purchased the property in 2007. They signed an August 16, 2007 note for $64,000, which was secured by a mortgage on the property. The note required initial monthly payments of $646.02. They also executed an assignment of rents to their lender. (CM-ECF, Doc No. 23-1, at 23-24.) They fell behind quickly, and in 2008, the debtor and Mr. House entered into a loan modification to increase the principal balance on the loan to reflect then-pending arrears. The new principal amount was $68,302.75. (*Id.* at 31.)

---

[2] After the evidentiary hearing, the debtor filed an amended plan (CM-ECF, Doc. No. 39) and CIT filed an objection to confirmation of that plan (CM-ECF, Doc. No. 48). The amended plan proposes to pay $447 per month to CIT plus 4.5% interest, as part of an $1100 monthly plan payment. CIT has objected to confirmation on multiple grounds.

## The Debtor's Multiple Bankruptcy Cases

The debtor has filed five Chapter 13 bankruptcy petitions since 2011 and the timing of several of those cases corresponds with CIT's efforts to foreclose on the property.[3] CIT filed its first foreclosure action on July 24, 2009, when mortgage payments were seven months past due. The Milwaukee County Circuit Court entered a foreclosure judgment for $89,196.62 on March 10, 2010, followed by a six-month redemption period and on January 28, 2011, a Notice of Sheriff's Sale. (Case No. 09 CV 11578).[4] The debtor testified she continued to rent the property after entry of the foreclosure judgment. She filed her first Chapter 13 bankruptcy petition (11-24643) on April 1, 2011, two months after entry of the foreclosure judgment. Her plan proposed to cram down CIT's secured claim to the value of the property, which she estimated to be $22,900, approximately one-third of the original contractual debt. That case was dismissed without a confirmed plan on December 28, 2011, because the debtor had failed to make plan payments. CIT received $1,195.00 while the case was pending,[5] and Ms. House later averred that she had been unable to continue to make payments because her husband lost his job. (Case No. 12-21257, CM-ECF, Doc. No. 10.)

The debtor filed her second Chapter 13 petition (12-21257) two weeks after the second notice of sheriff's sale issued on January 24, 2012 (Case No. 09 CV 11578). Her plan proposed to cram down CIT's claim to the value of the property, which the debtor again estimated to be $22,900. The court confirmed her plan in February 2013, but dismissed the case the next month for failure to make payments. Before dismissal, CIT received $1,034.33 in interest through the debtor's plan. The debtor later averred that unexpected funeral expenses

---

[3] The debtor also filed a Chapter 7 case in 2008.

[4] Larry House filed Chapter 7 petitions in the Eastern District of Wisconsin on September 7, 2010 (three days before the redemption period ended) and on November 11, 2010. He filed a Chapter 13 petition on September 26, 2013 in the Northern District of Illinois.

[5] These appear to be pre-confirmation adequate protection payments included in the plan.

prevented her from keeping up with plan payments. (Case No. 13-29804, CM-ECF, Doc. No. 7.)

The sheriff held a foreclosure sale of the property on July 1, 2013 (Case No. 09 CV 11578). On July 19, one week after CIT filed a motion to confirm the sale in state court, the debtor filed her third Chapter 13 bankruptcy case (13-29804). This case resulted in a confirmed plan, which included a cram down of CIT's secured claim to $25,450. Over the course of this case, CIT received $12,172 in principal and interest, and other creditors received approximately $10,000. Because the funds received were sufficient to cure the underlying default that led to the 2009 foreclosure action, CIT vacated its judgment and dismissed its foreclosure suit. But the court dismissed the debtor's third case on September 26, 2016, after 38 months, because she defaulted on an order requiring her to pay certain tax refunds. The debtor allowed her case to be dismissed after the trustee objected to her modified plan as infeasible.[6] The debtor later testified that reduced pay from a new employer training program, and then medical issues which kept her off work, prevented her from making the required plan payments.

The debtor filed her fourth Chapter 13 bankruptcy petition (16-32130) three months later on December 20, 2016, and sought an extension of time to file her schedules due to efforts to obtain a valuation of the property. She initially proposed plan payments of $711 and to cram down the amount due on the property to $20,000. She modified her plan to meet CIT's objection, and offered plan payments of $1,000/month. But the court dismissed her case without confirmation on August 25, 2017 for failure to make plan payments, and denied her *pro se* motion to reconsider the dismissal order. During the

---

[6] The debtor originally objected to the trustee's affidavit of default in support of her motion to dismiss, which was based on the debtor's failure to pay the trustee one-half of her 2015 income tax refunds or to file a modified plan to account for those refunds. The debtor simultaneously filed a modified plan purporting to pay the trustee the amount of the overdue refunds. The trustee objected to confirmation of the proposed plan as being infeasible, noting that the debtor currently was in default under a doomsday on plan payments. After the trustee objected to confirmation, the debtor withdrew her objection to the affidavit of default, and the case was dismissed.

eight months of her fourth case, the debtor had paid the trustee only $2,000, but that amount was refunded to her because the case was dismissed before confirmation and the debtor's plan did not require the trustee to make any pre-confirmation adequate protection payments. CIT received no payments during the debtor's fourth case.

Later, in trying to explain why her fourth case was not successful, the debtor averred that surgery and recovery due to a broken ankle required an unspecified amount of time off work and consequent reduced income. (CM-ECF, Doc. No. 15.) The debtor also testified that marital troubles compounded her difficulties.

On October 24, 2017, the debtor filed the current case, her fifth Chapter 13 bankruptcy, proposing to pay $1,174/month and once again to cram down CIT's claim on the property to $24,000, and pay it through her plan.

### Evidence About Rent Receipts

Ms. House testified that since 2007, she has lived at the property periodically when separated from her husband. Primarily, however, she has rented it to family and non-family for monthly amounts ranging from $495 to $1,025. Ms. House told the Court that the current tenants pay about $600 per month. The debtor has never evicted an occupant for non-payment, despite periods of non-payment. Ms. House testified that in some years rental receipts averaged $500 per month, in other years less. She testified the property was vacant for a time due to fire and need for extensive repair, though she did not provide dates.

Additional relevant detail is available in the sworn schedules from each of the debtor's cases concerning projected rental receipts—appearing on each Schedule I—and rent actually received—appearing on each Statement of Financial Affairs ("SOFA"). The Court takes judicial notice of the records in this case and the debtor's prior cases. *See* Fed. R. Evid. 201. The debtor's sworn assertions in her schedules and statements have evidentiary effect under Fed. R. Evid. 801(d)(2). *In re Vee Vinhee*, 336 B.R. 437, 449 (9th Cir. B.A.P. 2005).

For her first Chapter 13 case, the debtor projected, as of 2011, to receive $1,050 in monthly rent. (Case No. 11-24643, CM-ECF, Doc. No. 15, at 18.) Yet in her SOFA filed in her 2012 case, she checked "None" for income received other than from employment, trade, profession or operation of the debtor's business in the past two years. (Case No. 12-21257, CM-ECF, Doc. No. 7, at 21.) In the SOFA she filed in her 2013 case, she estimated that she received $833 each month in rent in 2011. (Case No. 13-29804, CM-ECF, Doc. No. 11, at 27.) In short, Ms. House supplied three different statements of monthly rent projections or receipts for 2011: $1,050, $833 and $0. It appears her Schedule I projection fell short by at least $210/month.

A similar mismatch between projected income and income actually received occurs in the 2013 filings, but not in the 2012 information. In her second Chapter 13 case, filed in 2012, the debtor projected she would receive $1,025 in monthly rent (Case No. 12-21257, CM-ECF, Doc. No. 7, at 18, 19), and her SOFA filed in the 2013 case states she earned $1,035 per month in 2012, as rent receipts (Case No. 13-29804, CM-ECF, Doc. No. 11 at 27). In her 2013 case, Ms. House projected she would receive $1,075 in monthly rent. (*Id.* at 22, 24.) But in her SOFA for that same case, she listed rents received in the first half of 2013 averaging only $720 per month. (*Id.* at 26.) So it appears her Schedule I projection in her 2013 case fell short by at least $355/month.

The debtor filed her next case in late 2016. Her Schedule I projected $0 for rent receipts. (Case No. 16-32130, CM-ECF, Doc. No. 14 at 35.) Her SOFA was consistent with that projection, stating that no rent was received in 2014, 2015 or the balance of 2016. (*Id.* at 40.) The schedules provide no explanation for this extended lack of payment.

Ten months later, the debtor filed the present case, projecting on Schedule I that monthly rent receipts are $540. (CM-ECF, Doc. No. 1, at 45.) Her latest SOFA reports no rent received in 2017, again with no explanation. (*Id.* at 51.)

## ANALYSIS

CIT requests that the Court exercise its power to grant *in rem* relief from the automatic stay under 11 U.S.C. § 362(d)(4).  CIT has the burden of proof to establish a right to *in rem* relief.  *In re Taal*, 520 B.R. 370, 377-78 (Bankr. D.N.H. 2014).

*In rem* relief may be granted where an ordinary order granting relief from the automatic stay will be ineffective to protect a secured creditor's rights.  *In re Mendiola*, 573 B.R. 758, 762 (Bankr. E.D. Wis. 2017) (citations omitted).  Courts will grant relief:

> with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, **if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved** either—
> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
> **(B) multiple bankruptcy filings affecting such real property.**

11 U.S.C. § 362(d) (emphasis added).  A properly recorded order for relief under section 362(d)(4) generally is binding on the property in any bankruptcy case filed in the next two years, such that the automatic stay remains lifted as to the real property subject to the order, even if the debtor files later bankruptcy petitions.

Because *in rem* relief is an extraordinary remedy, it is available only when all three conditions of section 362(d)(4) are met.  Two of the three conditions are satisfied here: CIT has a secured claim in the real property, and the debtor has filed multiple bankruptcies that affect the property.  A deeper look at the evidence is required to determine whether the "scheme" condition also is satisfied.

Congress clarified the creditor's burden under section 362(d)(4) in 2010, when it amended the statute to make the terms 'delay,' 'hinder,' and 'defraud' disjunctive.  *See Mendiola,* 573 B.R. at 763, *citing In re Spencer*, 531 B.R. 208, 217 (Bankr. W.D. Wis. 2015).  But Congress stopped short of defining the term "scheme."  Courts have employed dictionary definitions, viewing "scheme" as "an intentional artful plot or plan."  *In re Wilke*, 429 B.R. 916, 922 (Bankr. N.D.

Ill. 2010). Ascertaining whether a scheme exists "will almost always [involve] extrapolation," because a debtor rarely admits to having conducted a scheme. *In re Briggs,* No. 12-BK-14853, 2012 WL 3780542, *5 (Bankr. N.D. Ill. Aug. 31, 2012).

Facts from which courts will extrapolate include not only how many cases make up the "multiple filings" element, but case resolution. Were the prior cases dismissed without confirmation, or without discharge? *See In re Procel*, 467 B.R. 297, 309 (S.D.N.Y. 2012). Were the debtor's prior cases "strategically timed" vis-a-vis potentially adverse state court action? *See In re Tejal Investment, LLC,* No. 12-28606, 2012 WL 6186159, *6 (Bankr. D. Utah, Dec. 12, 2012); *In re Briggs,* 2012 WL 3780542, *6; *In re Olayer,* 577 B.R. 464, 469 (Bankr. W.D. Pa. 2017) (strategically timing a bankruptcy to stay foreclosure proceedings can be a legitimate tactic, but it evokes bad faith when commenced without the ability or intent to reorganize). Is there evidence of a change in circumstances necessitating the filings? *Id.* Did the debtor have a legitimate belief she could reorganize, in each case? *In re Khurana,* No. 15-20205, 2015 WL 4464508, *9 (Bankr. D. Idaho, July 21, 2015). Is there a "tag-team" pattern of serial filings by each co-debtor? *See In re Selinsky,* 365 B.R. 260 (Bankr. S.D. Fla. 2007) (describing how one member of the "tag-team" files a petition and uses dilatory tactics to delay dismissal, such as seeking extensions to file schedules; after that case is dismissed the "tag-team" waits for the next foreclosure event for one of the co-debtors to file another case in bankruptcy).

### 1. *An earlier good faith finding may be persuasive, but is not conclusive.*

CIT first argues that even though the debtor overcame the presumption of bad faith in filing her fifth Chapter 13 case, that success does not preclude a finding of a scheme to delay or hinder this particular creditor from protecting its rights to the collateral. In response, Ms. House contends there is no evidence of any nefarious scheme, and that the Code in fact does allow some "hindering" of creditor rights in order for debtors to save their properties. *See,*

*e.g., In re Danley,* 540 B.R. 468, 476 (Bankr. M.D. Ala. 2015) ("[A]ll bankruptcy filing have at least the short-term effect of delaying creditors."). The debtor maintains the Court's order continuing the stay is a conclusive finding of good faith obviating any potential to find otherwise in this section 362(d)(4)(B) motion. (CM-ECF, Doc. No. 30, citing CM-ECF, Doc. No. 20.)

The Court rejects the debtor's argument that the order continuing the stay precludes the Court from later finding a scheme to hinder, delay or defraud such that *in rem* relief is inappropriate. A Colorado court explained the interaction between the section 362(c)(3)(b) lack of good faith presumption and the scheme to delay, hinder or defraud of section 362(d)(4)(B):

> The very first clause of § 362(c)(3)(C) limits its application specifically to motions for extension filed under § 362(c)(3)(B) because it states that it only applies "for purposes of subparagraph (B)." 11 U.S.C. § 362(c)(3)(C) ((referring to 11 U.S.C. § 362(c)(3)(B)). Moreover, § 362 makes specific provision for relief under § 362(d) where "the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved ... multiple bankruptcy filings affecting such real property." 11 U.S.C. § 362(d)(4)(B). **That provision in § 362(d)(4)(B) would be wholly superfluous if Congress had intended to import § 362(c)(3)(C)'s presumption of bad faith based on multiple filing into § 362(d)**.

*In re Juarez,* 533 B.R. 818 (Bankr. D. Colo. 2015) (emphasis added).

The *Juarez* court acknowledged there might be an overlap in some circumstances, but reiterated that the section 362(c)(3)(C) presumption is limited to motions for extension of the stay under § 362(c)(3)(B). *In re Juarez,* 533 B.R. at 823, *citing In re Ford,* 522 B.R. 829 (Bankr. D.S.C. 2014):

> The statutory presumption of bad faith found in § 362(c)(3)(C) "is limited in its application . . . to the determination of whether the automatic stay should be extended." Therefore, a finding of good faith in the granting or denial of a § 362(c)(3)(B) motion to extend the automatic stay is not controlling as to the examination of good faith in the filing of the petition for other purposes. However, the Court's finding of good faith at the time of such a motion may be a persuasive factor in other contexts such as a determination of cause for relief from stay under § 362(d)(1) on the grounds of bad faith.

*Id.* A more recent example is *Mendiola,* where the debtor filed a timely and unopposed motion to continue the stay, and the court ordered the stay continued; nevertheless, the court subsequently granted *in rem* relief based on

the number and timing of prior cases, as well as the failure to convey to the mortgage lender the bulk of the rent the debtors had collected over the years. 573 B.R. at 764.

Therefore, while the prior order continuing the stay may have some persuasive effect, it does not preclude a finding, after review of additional evidence, that *in rem* relief is appropriate now.[7]

### 2. *The quantum of prior bankruptcy cases is persuasive, but not determinative.*

CIT next argues that *in rem* relief is appropriate based on the number of bankruptcy cases filed. The debtor and co-debtor Larry House have filed eight bankruptcy cases since 2010, none of them joint cases. CIT asserts that each of those cases was filed on the eve of a foreclosure event. CIT points again to *Mendiola*, where the court concluded "[t]he number and timing of the debtor's Chapter 13 petitions compels the conclusion that the debtor's bankruptcy petition was part of a scheme as that term is used in section 362(d)(4)." 573 B.R. at 763. The debtor doesn't address directly the number of prior cases. Instead, she relies on the protective policies of the Code to argue that her history shows only a continuous effort to stay in a viable plan and make mortgage payments through her plan(s).

To be clear, the bare number of prior bankruptcy cases does not, *ipso facto*, mean a court will conclude that a scheme to delay or hinder exists in a particular case. *In re Gray*, 558 Fed. Appx. 163, 166 (3d Cir. 2014); *In re Olayer*, 577 B.R. at 468-69. Instead, courts take a deeper dive, reviewing the reasons for success and failure of a debtor's prior cases, and the debtor's treatment of the particular lender. For example, the *Ford* court considered the debtor's three prior bankruptcy cases. 522 B.R. at 840. Her first case was filed fifteen years earlier, and she successfully completed her second case, paying the full arrearage owed the mortgage lender and obtaining a discharge.

---

[7] Because the Court grants *in rem* relief, it need not decide whether to grant CIT's alternative request for relief from the co-debtor stay pursuant to 11 U.S.C. section 1301(c)(2).

The debtor's third case lasted four years before dismissal. The *Ford* court considered that while the debtor's multiple bankruptcies had delayed the lender's recovery of the property as collateral, the successful completion of her second case and long duration of her third case evidenced not a scheme to delay but a dedication to pay the lender's debt. *In rem* relief was denied.

The *Mendiola* court reached a different conclusion. In addition to considering that the debtor had filed six bankruptcy cases in six years, the court found that the debtor made no serious effort to see his cases to completion, did not remit rent collected to the lender, and the debtor's filings thwarted three different foreclosure proceedings brought by the lender. 573 B.R. at 765. Together these facts evidenced a scheme to delay or hinder the creditor. In *Danley*, 540 B.R. at 468, the debtors filed their first bankruptcy case after their lender filed a foreclosure action against their rental property. The case was dismissed for failure to file schedules. Receiving a notice of default from their mortgage lender, the debtors filed their second bankruptcy case, but didn't fund their plan. Four years after that case was dismissed, the creditor sent a notice of foreclosure sale. One of the debtors filed the third bankruptcy case, but voluntarily dismissed it three months later. Within the year the lender sent another notice of foreclosure sale, whereupon the debtors filed their fourth case on the same day as the scheduled sale. The *Danley* court granted, and affirmed on reconsideration, *in rem* relief because the timing of each prior bankruptcy case was tied directly to foreclosure activity, the reasons for dismissal of at least several of the bankruptcy cases suggested a lack of good faith, and there was no evidence of feasibility of the present case. 540 B.R. at 478-480.

In another case where the mortgage lender sought *in rem* relief to recover non-homestead property, the debtors had filed ten bankruptcy cases in seven years. *In re Briggs,* 2012 WL 3780542. The court found the bankruptcies were strategically timed to the foreclosure action, and the prior case dismissals each related to a failure to comply with court orders. There was no real change in circumstances between the debtors' cases, and therefore the court concluded

that the debtors had employed a scheme to delay or hinder the lender from asserting its rights in the property. *Id.* at *6. The court considered "tag-team" bankruptcy filings by two spouses, in *In re Taal*, 520 B.R. at 370, 379, but ultimately concluded there was no scheme to delay or hinder the creditor. The *Taal* court noted that errors in the debtors' schedules were merely ordinary, and not the result of bad faith. While at least one of their cases was filed on the eve of a foreclosure, that was not clearly the case for the other two priors. Moreover, during the pendency of the husband's case, the wife continued to make payments to the lender. Overall, the *Taal* court concluded that the debtor wife demonstrated a serious bankruptcy purpose in filing her cases, and denied the request for *in rem* relief. *Id.*

Another court took a close look at the debtor's prior cases, noting that in his most recent case he had filed eleven plans over six years, achieving plan confirmation and ultimately discharge. *In re Olayer*, 577 B.R. at 469. During that time the mortgage creditor received substantial payments. Even though the debtor had filed a total of five Chapter 13 petitions in 21 years, the court declined to find that the facts supported a scheme to delay or hinder the creditor's rights, instead characterizing the debtor's most recent efforts as a "relentless pursuit of a solution." 577 B.R. at 469. The *Olayer* court considered the progress made in the debtor's fourth case overcame other evidence suggesting a basis for *in rem* relief.

Here, Ms. House filed each of her first three cases very shortly after action in CIT's 2009 foreclosure case. In addition, Larry House's Chapter 7 filings in 2010 likely served to delay the 2011 Notice of Sheriff's Sale. But CIT dismissed its foreclosure case after the original arrears were repaid, and so the debtor's fourth and fifth cases were not filed "on the eve" of any foreclosure event. Viewing her third case on its own, the debtor's repayment of the original arrears and CIT's dismissal of the foreclosure action arguably showed more of a "dedication to pay" than a scheme to delay CIT. *See In re Ford*, 522 B.R. at 841. But the Court declines to view the debtor's third case as a "relentless pursuit of a solution," *see In re Olayer*, for several reasons. The debtor allowed

her third case to be dismissed before discharge, and was delinquent in plan payments at the time, but she filed her fourth case just three months later, ultimately proposing to pay $1,000/month in plan payments. Having failed to keep up with payments in her third case, the Court questions whether the debtor had a true basis to believe she could achieve reorganization, even though she proposed, again, substantial plan payments. *See In re Khurana*, 2015 WL 4464508. The Court also questions whether the debtor experienced a true change in circumstances between her third and fourth cases, as she later asserted both were dismissed in part due to ongoing medical issues. *See In re Briggs*, 2012 WL 3780542, at *6.

The debtor's history of rent collection bolsters the conclusion that the prosecution and dismissal of her cases is a scheme to delay or hinder CIT's property rights. During her third case, the debtor may have collected substantial rent on the property in 2013. But despite the measured success of her third case, the debtor accrued fresh arrears to CIT since the 2009 foreclosure action. No doubt her failure to collect any rent from 2014 through at least 2016 exacerbated the extent of the arrears. The debtor offers no meaningful explanation for this failure. Her history of not collecting rent since 2014 undercuts the credibility of her Schedule I projection that she will collect monthly rent of $540 going forward, as does the fact that in the years when she did collect rent, her projections proved short by at least $210-$355 per month.

Accordingly, the Motion of CIT Bank, N.A. for an order pursuant to 11 U.S.C. § 362(d)(4) is granted. A separate order will be issued.

Dated: March 26, 2018

By the Court:

Beth E. Hanan
United States Bankruptcy Judge